UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PRUDENTIAL INSURANCE COMPANY )
OF AMERICA,                   )
                              )
            Plaintiff,        )
                              )
     vs.                      )        No. 4:03-CV-1736 (CEJ)
                              )
MARY BETH KAMRATH and         )
SHARRI KAMRATH ROCCA, as      )
Personal Representative of the )
Estate of Bradley G. Kamrath, )
                              )
            Defendants.       )

**MEMORANDUM**

This matter is before the Court for findings of fact and conclusions of law following a bench trial. See Fed. R. Civ. P. 52.

Bradley G. Kamrath was a participant in a group life insurance plan sponsored by the Insurance Trust of the American Institute of Certified Public Accountants ("AICPA"). On August 1, 1989, plaintiff Prudential Insurance Company of North America issued Mr. Kamrath a group life insurance policy insuring his life for $500,000. At the time the policy was issued, defendant Mary Beth Kamrath, Mr. Kamrath's wife, was named as the primary beneficiary. Mr. Kamrath committed suicide on September 27, 2003. Defendant Kamrath and defendant Sharri Kamrath Rocca, as personal representative of Mr. Kamrath's estate, both requested forms to claim the insurance proceeds. On December 4, 2003, plaintiff filed this interpleader action, asking the Court to determine whether defendant Kamrath or defendant Rocca should receive the life

insurance proceeds. Plaintiff deposited into the Registry of the Court $508,086.72, representing the benefits due under Mr. Kamrath's policy. A counterclaim filed by defendant Kamrath was dismissed with prejudice by stipulation of the parties. The plaintiff was excused from participation in the trial, and asks that it be dismissed from this action and awarded its attorneys' fees and costs. The remaining dispute is between defendants Rocca and Kamrath remain, each of whom claims to be the beneficiary of Mr. Kamrath's life insurance policy.

The Court heard evidence in the course of a one-day bench trial on August 22, 2005. The Court, having considered the testimony of the witnesses, exhibits received into evidence, and the briefs filed by the parties, makes the following findings of fact and conclusions of law:

## I. Evidence Presented

Bradley and Mary Beth Kamrath were married on May 20, 1988. Both Mr. and Mrs. Kamrath were certified public accountants and AICPA members. In August 1989, Prudential issued Mr. Kamrath a group policy insuring his life for $500,000. The policy was purchased from plaintiff Prudential, sponsored by the AICPA Insurance Trust, and administered by third-party administrator Aon Insurance Services. The State of New York is designated as the policy's governing jurisdiction. Mr. Kamrath also purchased a spousal coverage policy, under the same AICPA group plan, insuring defendant Kamrath's life in the amount of $300,000. Mr. Kamrath was the named beneficiary under that policy. Additionally, Mr.

Kamrath had a $20,000 life insurance policy through his group health insurance that named defendant Kamrath as his beneficiary. That policy is not at issue in this case. The couple paid the premiums on both Prudential policies from their joint checking account. The payments were sent to Prudential in New York. Defendant Kamrath testified at trial that the final premium on Mr. Kamrath's policy was paid from the business account of the couple's CPA practice in 2002.

The Kamraths lived in Illinois when the Prudential insurance policies were purchased. The expectancy of their first child in August 1989 prompted the life insurance policy purchases. Defendant Kamrath testified that the couple began experiencing marital problems after Mr. Kamrath had a panic attack in January 1994. Mr. Kamrath obtained psychiatric treatment and medication after this attack. The couple's second child was born in May 1994, and their third child was born in April 1999.

In October 1999, the Kamraths moved from Illinois to Rolla, Missouri and purchased a CPA practice. Defendant Kamrath testified that Mr. Kamrath did not continue receiving psychiatric care in Missouri, but a family doctor continued him on the medications. She testified that the couple began paying the premiums on their life insurance policy from Missouri in 1999.

Defendant Kamrath testified that she and her husband again experienced marital difficulties in 2001. Their problems escalated in 2002 as they faced two big issues. First, Mr. Kamrath exhibited signs of depression. Defendant Kamrath testified that Mr. Kamrath

slept 17 hours a day, ran into walls, and spent time staring out of windows. He could not function to care for the children. A psychiatrist in St. Louis diagnosed him as suffering from major depression and prescribed new medication.

Second, defendant Kamrath became increasingly concerned about the nature of her husband's relationship with an 11-year-old boy named Josh. Josh was a player on the Rolla youth football team that Mr. Kamrath coached. Mr. Kamrath and Josh's mother entered an arrangement for Mr. Kamrath to mentor her son, as she was a single parent. Defendant Kamrath testified that Josh lived with the Kamrath family about 50 percent of the time. He even went on vacation with them. Josh and Mr. Kamrath shared a bed when Josh stayed with the Kamraths, defendant Kamrath testified, and she became concerned that Mr. Kamrath was having an inappropriate sexual relationship with Josh.

In late 2002, defendant Kamrath told Mr. Kamrath about her concerns regarding his relationship with Josh. Mr. Kamrath denied the allegations. On December 13, 2002, Mr. Kamrath moved out of the Kamrath family home. Defendant Kamrath obtained an *ex parte* order of protection to restrict Mr. Kamrath's contact with his children. The protection order expired and was not renewed when defendant Kamrath failed to appear at a hearing. The Missouri Division of Family Services began investigating Mr. Kamrath's relationship with Josh in late December 2002, or early January 2003. Mr. Kamrath terminated defendant Kamrath from their CPA practice. He filed for divorce on December 31, 2002. Also in

2002, the final payment on Mr. Kamrath's life insurance policy was paid from the business account of the couple's CPA practice.

Defendant Kamrath testified that she and her husband established a voluntary visitation arrangement for him to see their children. During the pendency of the divorce, Mr. Kamrath and defendant Kamrath shared a 50-50 split of residential custody with their oldest child. As time progressed, the middle child's time with his father increased, and he eventually had overnight visits with Mr. Kamrath. The youngest child saw her father throughout the summer and also eventually had overnight visits with him. Defendant Kamrath testified that her husband thought she was using the children as a weapon against him.

Mr. Kamrath's mother, Rose Kamrath, testified that she and her son frequently conversed about the divorce. In a February 2003 phone conversation, Mr. Kamrath told his mother that he was going to change the beneficiary on his life insurance policy. She testified that Mr. Kamrath insinuated that she would be the beneficiary. Rose Kamrath also testified that Mr. Kamrath told her that he needed to get his children named in his will and make them the beneficiaries of his life insurance. He specifically mentioned the $500,000 insurance policy. Rose Kamrath told defendant Rocca's attorneys about this conversation when she assisted them in preparing answers to defendant Kamrath's interrogatories.

On March 6, 2003, Mr. Kamrath met with attorney John Z. Williams in Rolla, Missouri. Williams testified at trial that Mr. Kamrath wanted him to prepare estate plan documents, including a

testamentary trust to receive the proceeds from his Prudential insurance policy for his children's support.  On March 29, 2003, Williams prepared a last will and testament, general durable power of attorney, and health care directive and health care power of attorney.  He wrote a letter dated March 31, 2003, to Mr. Kamrath asking him to review the documents and make an appointment to sign them.  Williams also wrote a letter dated March 31, 2003, to Aon Insurance requesting a change of beneficiary form for Mr. Kamrath's Prudential policy.  The letter requested that the form be sent to Mr. Kamrath if privacy laws would not allow Aon to send the form to Williams's office.

On April 3, 2003, Mr. Kamrath executed the estate plan documents at Williams's office.  Mr. Kamrath appointed his sister and only sibling, defendant Rocca, as the agent, and his mother, Rose Kamrath, as the alternate agent, for both his general durable power of attorney and his durable power of attorney for health care.  Defendant Rocca was also named as personal representative of Mr. Kamrath's estate and trustee of his testamentary trust.  Rose Kamrath was also the alternate for these appointments.

Mr. Kamrath attempted to disinherit defendant Kamrath in his last will and testament stating: "I am a married person but at the time I sign this Will there is an action pending for dissolution of my marriage.  Accordingly, I make no provision herein for my wife."  Mr. Kamrath's will directs that his debts, expenses from any illness, and his funeral be paid as soon as practicable after his death.  In a residuary clause, he directed that all of his estate

assets be put into trust for the benefit of his three children to provide for their education, maintenance, support, and health emergencies or other misfortunes. Williams testified that the trust could also be funded by gifts separate from the estate. The will does not refer to any life insurance policy.

On his April 3, 2003, visit to Williams's office, Mr. Kamrath brought the third page of an assignment form from Prudential Insurance Company, in an attempt to change the beneficiary on his life insurance policy. Williams testified that he believed the form was a change of beneficiary form. The top of the form reads "Important Notes." The first sentence on the page reads, "A copy of the endorsement of the Beneficiary Provision/Change of Legal Name will be forwarded to you for attachment to the Certificate of Notice(s) of Insurance in your Possession." Three additional paragraphs address the manner in which living beneficiaries will be identified and how proceeds will be paid. Two lines separate the "Important Notes" from a section titled "ASSIGNEE DESIGNATION," which states: "THE PRUDENTIAL INSURANCE COMPANY OF AMERICA (hereafter referred to as the Company) is hereby requested to change the Certificate/Notice(s) of Insurance Number(s) ____, ____, ____, ____as follows." Mr. Kamrath's life insurance policy number is written in the first blank. Immediately following is the heading "Beneficiary Provision" with "See Important Notice on Page 1" directly beneath. Then, the form states: "If the Policy(ies) mature(s) by death, the proceeds then payable shall, subject to any facility of payment provision which may apply, be payable to the

Beneficiary(ies), designated below." The next line reads, "Beneficiaries in Order of Priority" with the following beneath:

**Primary**

| Name* | Relationship to Insured | DOB | % |
|-------|------------------------|-----|---|
| _____ | _____ | ____ | ____ |
| _____ | _____ | ____ | ____ |

**Contingent**

| Name* | Relationship to Insured | DOB | % |
|-------|------------------------|-----|---|
| _____ | _____ | ____ | ____ |
| _____ | _____ | ____ | ____ |

*If a Trust is named as a beneficiary, please include name of trustee.

Dated at _____this _____day of____, 20__.

Signature of Assignee: X_____

Witness: X_____
Attention: Please note that the signature of the Assignee must be witnessed by a disinterested party.

The words "Estate of Insured" are written under "Name" and "100" is written under "%" on the first space for designating a primary beneficiary. The remaining spaces are left blank. The form is dated April 3, 2003, at "Rolla." Mr. Kamrath executed the form next to the words "Signature of Assignee." Williams signed the form as a witness. Williams wrote a letter dated April 4, 2003, to Aon Insurance to accompany this form. The letter stated: "We represent Bradley G. Kamrath in conjunction with developing his estate plan. Enclosed please find a change of beneficiary form for the above policy of insurance. Please endorse this change on your records and confirm the endorsement to the insured."

Mr. Kamrath did not take the first two pages of the form to Williams's office.  However, Thomas Fremont, a manager at Aon Insurance, identified a copy of the complete assignment form during his deposition.  At the top of the first page of the form are the words "Instructions for Assignment Form."  The first paragraph reads, "Important Notice" and gives instructions to assure the accuracy of the form.  Next, several bullet points under a section titled "Assignments" explain what assignments are.  One point states, "The Insured transfers ownership by completing the Assignment of Group Insurance Form.  The new owner then designates a beneficiary."  The second page of the form reads "Assignment Form," and allows the insured to assign his rights to his group insurance policy to another.  The following page is an assignee designation form identical to the one Mr. Kamrath took to Williams's office followed by a "Change of Legal Name" form.  The final page reads "Addendum A" and gives space to designate a trustee if a trust has been named beneficiary.  It also has space for "Trustee (Under Will) Designation" for cases where a testamentary trust exists.

At trial, Williams testified that he had worked on several thousand change of beneficiary or estate plans, like Mr. Kamrath's, throughout his career.  He also testified that the form Mr. Kamrath brought in contained language identical to a typical change of beneficiary form, and the words "assignee designation" did not bother him.  Williams stated that he knew the form Mr. Kamrath brought in could not have been the response to Williams's request

to Aon Insurance for a change of beneficiary form. That request had been mailed on March 31st, and Mr. Kamrath brought the form at issue to Williams on April 3rd. Williams also testified that he did not know what was on page one of the form Mr. Kamrath brought in. Most of the time, he testified, the first pages of a change of beneficiary form are cover sheets with instructions. Williams testified at trial that Mr. Kamrath left the form with Williams to mail, and he gave the form to his secretary to copy and mail.

Williams testified at trial that he had done all he knew to effectively change Mr. Kamrath's beneficiary. He also testified, "The only thing that would be if he was watching for an acknowledgment of the receipt of the change in the company." He later testified that he advised Mr. Kamrath to watch for endorsement confirmation. Williams testified that he never received a response to his letter and the form or any other communication from Aon Insurance. Williams did not have any further contact with Mr. Kamrath after April 3, 2003. After Mr. Kamrath's death, a copy of the assignee designation form executed at Williams's office was found in a box of papers defendant Rocca took from Mr. Kamrath's home.

Fremont, who manages the department that receives change of beneficiary forms, testified that Aon Insurance did not receive the form Mr. Kamrath executed on April 3, 2003, at Williams's office. He further testified that Aon Insurance would not have accepted the assignee designation form as a change of beneficiary form. He testified that Mr. Kamrath was never an assignee but was owner of

-10-

the insurance policy. He also testified that Aon Insurance would not accept a lawyer's signature as a disinterested party. Fremont testified that if Aon Insurance had received the form Mr. Kamrath signed, it would have sent it back with a new change of beneficiary form and a cover letter explaining the return. He also testified that Aon Insurance's records show defendant Kamrath as the beneficiary of Mr. Kamrath's policy as of the date of his death.

Fremont also testified that Aon Insurance received Williams's March 31st letter requesting a change of beneficiary form on April 4, 2003. A change of beneficiary form was sent to Mr. Kamrath on April 7, 2003. The change of beneficiary form differs greatly in appearance from the assignee designation form that Mr. Kamrath signed. The language on the two forms is almost identical. However, the change of beneficiary form uses the word "insured" instead of "assignee." The words "assignee designation" do not appear on the change of beneficiary form. Additionally, the instruction pages that accompany the change of beneficiary form differ greatly from the pages that accompany an assignee designation form. Fremont testified that Aon Insurance did not receive a correct change of beneficiary form prior to Mr. Kamrath's death.

In her May 18, 2005 deposition, Rose Kamrath testified about a second phone conversation that she had with Mr. Kamrath in April 2003. She testified that it was during this conversation that Mr. Kamrath told her that he had changed his beneficiary. According to Rose Kamrath, "[H]e said, 'I changed my insurance policy over to

-11-

the children and I finally got my will done', like that." She testified that she did not remember this conversation until after October 2004, when defendant Rocca submitted answers to interrogatories, and that she told defendant Rocca about it in December 2004 or January 2005.

In July 2003, defendant Kamrath approached Mr. Kamrath about changing the beneficiary on the life insurance policy the couple took out on her life, she testified at trial. Mr. Kamrath told her that she could not change him as her beneficiary and he could not change her as his beneficiary until after the divorce was final. Defendant Kamrath testified that she did not try to change her beneficiary because she believed what Mr. Kamrath told her. Mr. Kamrath did not mention to her that he had changed or attempted to change his beneficiary, she testified. The parties have stipulated that the Prudential policies insuring the lives of Mr. Kamrath and defendant Kamrath were listed as marital property in the dissolution proceeding in a filed "Statement of Marital and Non-Marital Property and Liabilities."

Defendant Kamrath testified that by August 2003, all three Kamrath children had overnight visits with Mr. Kamrath. During the summer months, the daughter, then four years old, was having night terrors and vaginal irritation. The girl shared information with her counselor that led to a DFS investigation. DFS sent defendant Kamrath a letter stating that there was probable cause to believe that Mr. Kamrath had sexually abused his daughter. The Rolla Police Department was investigating the accusations as a sexual

assault, according to the police report filed after Mr. Kamrath's death.  At that time, Mr. Kamrath and his attorney voluntarily withdrew his request for visitation rights.

On September 5, 2003, Mr. Kamrath called Aon Insurance and requested a change of beneficiary form for the policy insuring defendant Kamrath's life.  Aon Insurance mailed Mr. Kamrath the appropriate form, which was dated September 5, 2003.  This form bore the account number of defendant Kamrath's policy, but it was otherwise identical to the form Aon Insurance sent Mr. Kamrath in April 2003 to change his beneficiary.  Defendant Kamrath testified that she did not learn of the request for her policy until after her husband's death.

On September 27, 2003, Mr. Kamrath died as a result of carbon monoxide poisoning.  He had connected one end of a hose to the exhaust pipe of his car and routed the other end into the passenger compartment.  The police found his body inside the car, with the engine still running.

The police found a handwritten note Mr. Kamrath left, directing the finder to call defendant Kamrath and giving her home and cell phone numbers.  It also gave Mr. Kamrath's social security number and his parents' phone number.  The note directed that the $400 in his wallet be given to his oldest child in payment of a debt.  Five sealed and hand addressed envelopes containing typed notes were found beneath the handwritten note.  Four of the envelopes were addressed to his daughter, his two sons, "Mary Beth," and "Mom, Dad, Grandparents, Graverts, John, Nancy Jacobs."

The outside of the fifth envelope read, "Directions about will etc. MB open." Additionally, a notebook was found with several messages written in it. He wrote, "I'm a family man with no family, cannot exist that way . . . Sorry Roya I can't live w/o my kids. I intend for my remaining IRA money to go to trust." Roya Hough was Mr. Kamrath's divorce attorney.

In the notes to his wife and his parents, Mr. Kamrath discussed his reason for committing suicide and how to handle his money. To his parents, grandparents, and sister, he wrote, "Those 3 kids were everything to me, and the probability that I was going to lose them reached a level I couldn't live with." As to his money, he wrote to his parents and sister: "There should be about 520K in insurance, all of it is supposed to go into the trust that is for the kids. Mary Beth may have to pay some debts off before the money can go into the trust. Please make sure the remainder gets there. It should be enough to insure that each kid can get a college education. I'm trying to be the great provider up to the very end." He also gave instructions for some of his personal items that were to go to his children.

Mr. Kamrath and defendant Kamrath were still married at the time of his death. In his letter to his wife, Mr. Kamrath wrote, "You know how much the kids meant to me, and I'm sure you knew that I could not live without them. It was too much to bear." He also wrote, "I'm not sure how the disbursement of life insurance will work; my intent is that it all goes into the trust that will be managed by Sharri, for the benefit of [the three children]. If it

cannot go into the trust directly, pay off all the debt and you will have 300,000 left, PLEASE place that money in the trust. In any case, make sure your spending habits don't blow it." Mr. Kamrath also expressed feelings for defendant Kamrath, stating, "In ways, I still love you and I'm sorry this whole mess happened." He signed the letter, "Love, Your Husband." In the letters to both his wife and parents, Mr. Kamrath requested that his parents, sister, and brother-in-law be a part of the Kamrath children's lives.

Mr. Kamrath also typed a document titled "Addition to Last Will and Testament." He left directions for defendant Kamrath to open the envelope containing these additions. He instructed that his body be cremated and stored until his oldest child reached 30 years old. Then, he wanted that son to scatter his remains at a site of significance to Mr. Kamrath and his children. Lastly, he wrote, "My life insurance policies are with AICPA and there is a small death benefit with my group Health Insurance. As described in my will, these funds are to go into a trust for the benefit of my children and managed by my sister, Sharri Rocca, according to the terms of the trust document."

The Rolla Police Department went to defendant Kamrath's home and informed her of her husband's death on September 27, 2003. In the days and months following Mr. Kamrath's death, defendant Kamrath claimed the proceeds to his $20,000 life insurance policy, and sold the couple's CPA practice. In 2004, defendant Kamrath and her children moved to Iowa to be closer to her family. Defendant

Kamrath testified at trial that she has taken the advice of counselors to not allow Mr. Kamrath's family to contact her children. She also testified that she would use the insurance money to cover the children's medical needs and pay for their educations.

Defendant Rocca, who lived in Minnesota at all relevant times, testified at trial that she and her brother were close and spoke more often after he separated from his wife. However, she did not learn that she had been appointed personal representative of the estate and trustee of the trust for his children until after Mr. Kamrath's death. She testified that he never told her that he had changed the beneficiary on his insurance policy or that he wanted the insurance proceeds to go into a trust. He never told her that he wanted her to manage a trust, she testified. She also testified that she would use the money to pay for the Kamrath children's college education and other needs. Mr. Kamrath's parents and sister buried his cremated remains in Iowa.

On October 9, 2003, Williams, on behalf of Mr. Kamrath's estate, sent Aon Insurance a letter requesting claim forms and instructions so that defendant Rocca could claim the proceeds payable on the estate's behalf. Aon Insurance informed Williams that it did not have a beneficiary form designating Mr. Kamrath's estate. On October 27, 2003, Williams faxed Aon Insurance a copy of the cover letter and form he and Mr. Kamrath signed in April 2003, designating Mr. Kamrath's estate as beneficiary. Meanwhile, defendant Kamrath completed a claim form seeking proceeds from the

policy on October 20, 2003.  Prudential brought this interpleader action on December 4, 2003, and deposited $508,086.72 into the Registry of the Court, consisting of the benefits due under Mr. Kamrath's policy.  No claims exist against Prudential, and it is no longer a party to this suit.

## II.  **Discussion**

The Prudential policy states the following in regard to beneficiary changes:

> At any time the Participant may, without the consent of his Beneficiary, change the Beneficiary by filing written notice of the change through the Policyholder on a form satisfactory to Prudential.  The new designation will take effect on the date the notice was signed, except that it will not apply as to any amount paid by Prudential before receipt of the notice.

The issue before the Court is whether the assignee designation form that Mr. Kamrath signed at Williams's office on April 3, 2003, designating "Estate of the Insured" as the sole beneficiary effectively changed the beneficiary of his policy.  Prudential waived strict compliance with the policy provisions when it filed the interpleader complaint and deposited the proceeds into the Registry of the Court.  <u>Metro. Life. Ins. Co. v. Barnes</u>, 770 F. Supp. 1393, 1397 (E.D. Mo. 1991); <u>McCarthy v. Aetna Life Ins. Co.</u>, 704 N.E.2d 557, 561 (N.Y. 1998).  Because the undisputed evidence shows that defendant Kamrath was the beneficiary of record as of the date of Mr. Kamrath's death, defendant Rocca carries the burden of proving that the beneficiary was effectually changed.  <u>See</u> <u>id</u>. at 1398 (finding that the insured's wife did not establish the insured's intent to change beneficiaries beyond question); <u>A.F.</u>

Green & Co. v. William Penn Life Ins. Co. of N.Y., 220 A.D.2d 317, 317 (N.Y. App. Div. 1995) (finding that insurer's records showing plaintiff as the named beneficiary establish a prima facie case of plaintiff's entitlement to the proceeds).

Defendant Kamrath argues that New York law applies because the Prudential policy states that the State of New York is the governing jurisdiction. Defendant Rocca argues that Missouri law applies pursuant to Missouri insurance statutes and the Restatement (Second) of Conflicts of Law. Both parties cite case law and statutes that deal with interpretation and application of insurance policy terms and provisions. However, the instant dispute does not require the interpretation of any provision of the policy or the change of beneficiary form. Thus, the policy's choice of law provision is not implicated. The Court finds that Missouri law applies to the issues involved in this case. Mr. Kamrath was a Missouri citizen and resident. He hired a Missouri estate planning attorney. He signed the assignment form in Missouri, and the form was mailed from his attorney's office in Missouri. The competing beneficiaries, defendant Kamrath and Mr. Kamrath's estate, were domiciled in Missouri at the time of Mr. Kamrath's death. Thus, this case involves whether, under Missouri law, Mr. Kamrath effectively changed his designation of beneficiary.[1]

---

[1]Some testimony was given as to actions and statements made during dissolution proceedings in regard to the couple's life insurance policies. However, the Court will not consider this evidence because the state court sealed the dissolution files and

Missouri applies the equitable doctrine of substantial compliance to cases where the insured has not strictly complied with the insurer's method for changing a beneficiary. Anglen v. Heimburger, 803 S.W.2d 109, 112 (Mo. Ct. App. 1990). "The equitable doctrine of substantial compliance makes an incomplete or irregular change of beneficiary effective against the original beneficiary where the insured has done all within his power to exercise his right to change the beneficiary." Id. The insured's intent is central, and he "must have done everything possible under the circumstances to effectuate his intent." Id. The substantial compliance test requires the Court to find both that (1) the insured's intent to change the beneficiary has been established beyond question, and (2) the insured has done everything possible under the circumstances. Barnes, 770 F. Supp. at 1397.

The Court finds that the requirements for substantial compliance under Missouri law have not been met in this case.[2] Defendant Rocca has not established beyond question that Mr. Kamrath intended to change the beneficiary. The evidence suggests

_____

only defendant Kamrath has access to them. She declined to permit disclosure of the file to defendant Rocca.

[2]Based on the Court's research, the result would be the same under New York law. Like Missouri, New York applies the equitable doctrine of substantial compliance. See McCarthy, 704 N.E.2d at 560 (stating that decedent must have "done all reasonably possible to show his intention to comply with the policy requirements); Cable v. Prudential Ins. Co. of Am., 89 A.D.2d 636, 636 (N.Y. App. Div. 1982) (finding "mere intent" insufficient to effect a change of beneficiary); In re O'Neill's Estate, 255 N.Y.S. 767, 775 (N.Y. Sur. Ct. 1932) ("Equity requires diligence. Therefore, where the insured failed to do all which might reasonably have been possible to effectuate his wishes, as to change a named beneficiary, aid will be denied.").

-19-

that Mr. Kamrath may have intended to change the beneficiary when he signed the assignee designation form on April 3, 2003, at Williams's office.  The possibility of this intention is also shown by his February 2003 discussion with his mother, his March and April 2003 discussions with his attorney, and his attorney's request for a change of beneficiary form.  Rose Kamrath testified that Mr. Kamrath told her in April 2003 that he had in fact changed the beneficiary designation to his children.  However, the weight of her testimony about this conversation is diminished by the fact that she did not disclose it to defendant Rocca's attorneys when she was assisting them in answering interrogatories.

Mr. Kamrath's behavior after April 2003 is inconclusive as to his intent to change his beneficiary.  In his letter to defendant Kamrath, he expressed uncertainty about how the life insurance disbursement would be made.  He directed her to pay off debts and asked her to "PLEASE place [the remaining $300,000] in the trust" for the children's benefit.  This shows that he believed defendant Kamrath would have control over the insurance proceeds.  It also shows his intent that the money go to trust for his children.  The method by which this was to be accomplished seemed less important.  An intent to put the proceeds in trust is distinct from an intent to change the beneficiary.  The evidence indicates that Mr. Kamrath was not confident that he had effectively changed his beneficiary.

In his note to his parents and his note titled "Addition to Last Will and Testament", Mr. Kamrath lumped his $500,000 Prudential policy and $20,000 group health policy together.  To his

parents, he wrote that he had $520,000 in insurance that was supposed to go to a trust for his children to pay for their college educations. In the will addition note to his wife, he wrote that the funds from the two policies were to go into a trust for the children's benefit "according to the terms of the trust document." These two letters show that Mr. Kamrath was most concerned about the money going to the trust. There is no evidence that Mr. Kamrath tried to change the beneficiary on his $20,000 life insurance policy. The only policy he mentioned to Williams and his mother was the $500,000 policy. Yet, in these notes he lumped the two policies together, giving the impression that Mr. Kamrath believed the monies could go into trust without changing the beneficiaries. This impression is further solidified by a handwritten note found near his body stating that he intended for his individual retirement account proceeds to go into a trust. No evidence has been presented as to who the beneficiaries are for this account, or that he tried to make any changes. Mr. Kamrath did not state how he expected his IRA or insurance proceeds to get to the trust; rather, his statements were only expressions of his wishes.

Mr. Kamrath also wrote to his parents that defendant Kamrath might have to pay off debts before the money could go to trust. He implored them to make sure the remaining funds went to the trust. This also shows his uncertainty of who controlled the insurance funds. He wrote that he thought defendant Kamrath would honor his wishes that she not interfere with his parents' relations with his

children.  Additionally, Mr. Williams testified at trial that gifts could be made to the trust from sources other than the estate.  The language of the trust does not give restrictions on how the trust will be funded.

Furthermore, Mr. Kamrath failed to ensure that Aon Insurance had acted on the form he completed to change the beneficiary on his policy.  The first sentence of the form stated that a copy of endorsement of the beneficiary change would be forwarded to him. Williams also testified that he informed Mr. Kamrath he should expect to receive a confirmation or endorsement to attach to the policy.  Thus, Mr. Kamrath knew to expect Aon Insurance to send him confirmation of the change.  If Mr. Kamrath intended to change his beneficiary, he could have followed up with his attorney and/or insurer to find out why endorsement confirmation was never received.  Additionally, Aon Insurance sent Mr. Kamrath a correct change of beneficiary form dated April 7, 2003.  The differences between the two forms should have prompted Mr. Kamrath to follow up on the status of his attempted change.

Finally, Mr. Kamrath never mentioned to defendant Rocca that he had changed the beneficiary of his Prudential insurance policy. It would have been reasonable for him to do so, considering that the siblings were close, they talked frequently, and Mr. Kamrath designated defendant Rocca trustee of his testamentary trust. Based on all the evidence, the Court concludes that Mr. Kamrath's intent to change the beneficiary has not been established.

Nevertheless, the Court will address the second factor of the

substantial compliance test, which requires proof that the insured did everything possible under the circumstances to change the beneficiary.[3]  See Anglen, 803 S.W.2d at 109, 112-13 (finding substantial compliance where insurer had not received a completed change form but an empty envelope that once contained a change of beneficiary form was located after the death of the insured, who suffered from cancer, was incapable of taking care of herself, and had requested a change of beneficiary form from her employer and insurer); Capitol Life Ins. Co. v. Porter, 719 S.W.2d 908, 911 (Mo. Ct. App. 1986) (finding substantial compliance where insured, who suffered from cancer, was wheelchair bound, and was totally incapable of taking physical care of himself, had obtained the change form, executed it, explained the purpose for the change to his mother and a witness, and expressed intent to forward the form to the insurer but had not mailed it).

Mr. Kamrath's circumstances differed materially from those of the insureds in Anglen and Porter.  Significantly, he was not physically ill, he was not dependent on others for his care, and he was not immobile.  Further, he dictated the circumstances of his death.  "It is axiomatic that what constitutes substantial

---

[3]In Barnes, 770 F. Supp. at 1397, the court found that Missouri has relaxed the second factor where there is clear evidence of the insured's intent.  This determination was made after review of two cases involving physically disabled insured persons.  This Court will not relax the second factor in the instant case because Mr. Kamrath's intent is unclear and the circumstances differ greatly from those in the cases the Barnes court considered.

compliance will vary with the circumstances of each case." Porter, 719 S.W.2d at 910-11.

The Court finds that Mr. Kamrath did not do everything possible under the circumstances. First, Mr. Kamrath and his attorney failed to take heed of the entire document that accompanied the assignee designation form that they signed. The form gave instruction to pay attention to its first page. Both Mr. Kamrath and his attorney ignored these words. Further, Mr. Kamrath signed next to the words "signature of assignee." No evidence has been presented showing that Mr. Kamrath so much as questioned what an assignee is and whether he was one. As discussed above, Mr. Kamrath did not follow up to find out why he had not received an endorsement confirmation. A follow up call to the insurer would have resulted in him learning that his wife was still the beneficiary of record. Mr. Kamrath did not return or complete the correct change of beneficiary form that Aon Insurance mailed to him on April 7, 2003. Additionally, he failed to tell defendant Rocca that he had designated his estate as the beneficiary, even though he spoke with her frequently. Further, it is evident from his suicide notes that he had not satisfied himself that his change of beneficiary was effective.

The Court finds that Mr. Kamrath failed to do all within his power to substantially comply with the policy requirements for changing his beneficiary. Therefore, the Court will not exercise its equitable power to change the beneficiary of Mr. Kamrath's Prudential insurance policy.

-24-

The plaintiff seeks to recover the attorneys' fees and costs it has incurred in connection with this interpleader action. An award of reasonable attorneys' fees and costs may be recovered by an interpleader plaintiff. See Millers Mut. Ins. Ass'n Ill. v. Wassall, 738 F.2d 302, 304 (8th Cir. 1984) ("Under the common law, courts have long awarded attorney fees and costs to a disinterested stakeholder out of an interpleaded fund."). The plaintiff's request will be granted.

For the reasons discussed above, the Court finds the issues in favor of defendant Kamrath, and judgment will be entered accordingly.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 21st day of February, 2006.